UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RONALD EUGENE MARTIN,

               Petitioner,                                  Hon. Paul L. Maloney

v.                                                      Case No. 1:06-CV-893

WILLIE SMITH,

               Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Martin's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Martin's petition be **denied**.


## BACKGROUND

        As a result of events which occurred January 16, 2003, Petitioner was charged with two counts of armed robbery. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Keith Merrit**

As of January 16, 2003, Merrit was employed as a police officer with the Port Huron Police Department. (Trial Transcript, January 6, 2004, 205-06). While on duty that day, Officer Merrit was dispatched to the Donut Shack, located at 3425 Electric Avenue, to investigate a "man down, bleeding" and "possible armed robber." (Tr. 206-07). When Merrit arrived at the Donut Shack, Officer Brian Georgia had already arrived and was "just coming up to the door of the Donut Shack." (Tr. 207). Merrit and Georgia approached the store together and were greeted at the front door by the owner of the Donut Shack, Rajinder Kapoor. (Tr. 207-09).

Officer Merrit observed that Kapoor suffered "a large cut" and "had blood coming down the left side of his face and head." (Tr. 210, 213). Kapoor told Officer Merrit that he had been robbed by two men, one of whom wielded a weapon. (Tr. 210-11). Officer Merrit also spoke with another witness to the robbery, Sam Dado. (Tr. 209).

Medical personnel arrived soon thereafter, at which point Kapoor was transported to a hospital. (Tr. 217). Officer Merrit then locked the front door to the Donut Shack so that he and the other officers on the scene could search for evidence and photograph the crime scene. (Tr. 217). Kapoor returned to the Donut Shack approximately 90 minutes later. (Tr. 217). Merrit and the other officers remained in the store until Kapoor "locked up the building" and departed. (Tr. 218).

**Christopher Bean**

As of January 16, 2003, Bean was employed as a City of Port Huron Police Officer. (Trial Transcript, January 7, 2004, 226). At approximately 9:00 p.m. that evening, Officer Bean was dispatched to the Donut Shack to photograph the crime scene. (Tr. 226-27). Upon entering the

store, Bean observed "what appeared to be blood near the entrance to the front door going back to a back storage room to the business." (Tr. 227, 234-35). Officer Bean observed blood on the floor of the rear storage room, as well as blood on a case of beer located in the storage room. (Tr. 235-36).

Bean discovered a still wet, "muddy footprint" on "top of the counter." (Tr. 238, 241). The footprint displayed a design with "cross-shaped lugs" in the center and "a tread pattern in the back of the heel." (Tr. 240). The footprint was too smeared, however, to accurately determine its length. (Tr. 257-58). Officer Bean also observed wet mud on the floor near the cash register. (Tr. 241).

An examination of the area immediately outside the Donut Shack revealed footprints in the snow with "a significant gap between each one, more than what would be if a person was walking." (Tr. 245-46). From this, Officer Bean surmised that "someone was running away from the scene." (Tr. 246). These particular footprints exhibited "a parallel tread pattern." (Tr. 248-49). On January 30, 2003, Officer Bean participated in the arrest of Larry Mack. (Tr. 229). Approximately two hours after Mack was arrested, Bean returned to Mack's residence to "retrieve a pair of shoes." (Tr. 229, 242). An examination of the soles of the shoes Bean retrieved, revealed a "parallel pattern." (Tr. 243).

**Brian Georgia**

As of January 16, 2003, Georgia was employed as a City of Port Huron Police Officer. (Trial Transcript, January 7, 2004, 263). Shortly before 9:00 p.m. that evening, Georgia was dispatched to the Donut Shack. (Tr. 263-64). Officer Georgia arrived almost simultaneously

with Officer Merrit. (Tr. 264). Upon his arrival, Georgia, seeing that Rajinder Kapoor was bleeding, requested an ambulance. (Tr. 264-65). Officer Georgia then obtained from Kapoor a description of his assailants. (Tr. 265).

**Sam Dado**

On January 16, 2003, at approximately 8:50 p.m., Dado was at the Donut Shack speaking with Rajinder Kapoor. (Trial Transcript, January 7, 2003, 274-75). A "young" black man then entered the store and requested a case of beer. (Tr. 275, 277-78). As Kapoor went to the cooler to retrieve the beer, Dado turned to depart the store. (Tr. 275-76). Before he was able to exit the store, however, a man wearing a mask entered the store wielding a "copper" colored gun and directed Dado to "get down." (Tr. 276-82). Dado complied with the man's request, at which point the man ran back to the cooler. (Tr. 285). Immediately thereafter, Dado heard "hollering and screaming" coming from the cooler. (Tr. 286). Dado then retrieved the cash from his pocket, between $900 and $1,200, and threw it to the first assailant. (Tr. 286-87). Dado told the man to "take the money and leave, just don't hurt nobody." (Tr. 286-88). The gun-wielding assailant then exited the cooler and walked to the cash register. (Tr. 288-89). This man removed the money from the cash register and then jumped "over the counter," at which point the two assailants exited the store. (Tr. 289-91). After the men exited the store, Dado telephoned the police. (Tr. 291).

**Rajinder Kapoor**

As of January 16, 2003, Kapoor was the owner of the Donut Shack. (Trial Transcript, Janaury 7, 2003, 303). On that evening, Kapoor was in his store discussing business matters with

Sam Dado. (Tr. 303-05). Shortly before 9:00 p.m., a black man entered the store and requested a case of beer from the cooler. (Tr. 306). The man then departed the store, however, without purchasing any beer. (Tr. 306). A "few minutes" later, the man returned and again requested a case of beer from the cooler. (Tr. 306-07). Kapoor went to the cooler to retrieve the beer. (Tr. 307-11).

As he was returning to the front of the store, Kapoor observed a second man, a black man wearing a mask, enter the store. (Tr. 311-12). This man was wielding a "gold-colored gun." (Tr. 313). This masked man approached Kapoor and instructed him to "get back, get back in the back." (Tr. 312-13). The man then struck Kapoor in the head with his weapon. (Tr. 314-15). The man with the weapon and the man who had requested the beer then pushed Kapoor to the ground and returned to the front of the store. (Tr. 315-18). After a moment, Kapoor got up and walked to the front of the store where he observed the two assailants "leaning over" the cash register. (Tr. 317-18, 333). The two men then screamed, "let's get out" and rushed out of the store. (Tr. 318-19). Kapoor later discovered that between $100-150 had been stolen from his cash drawer. (Tr. 341-42). Kapoor also observed mud on the top of the counter near the cash register. (Tr. 339-41).


**Joseph Platzer**

As of January 16, 2003, Platzer was employed as a City of Port Huron Police Officer. (Trial Transcript, January 8, 2004, 380-81). Platzer was assigned to investigate the robbery of the Donut Shack. (Tr. 381). Pursuant to his investigation, Officer Platzer arrested Petitioner on January 30, 2003. (Tr. 381-88). Later that evening, Officer Platz arrested Larry Mack. (Tr. 388-89). Platzer then interviewed Mack. (Tr. 390). At the outset of this interview, Mack was not cooperative. (Tr. 390-91). By the end of the interview, however, Mack agreed to cooperate with

Platzer in his investigation of the Donut Shack robbery. (Tr. 391).

After interviewing Larry Mack, Officer Platzer interviewed Petitioner. (Tr. 391-92). Petitioner acknowledged that he was present at the Donut Shack "prior to the robbery," with Mack and a woman named Audrey, but insisted that he did not participate in the robbery. (Tr. 392-93). When Platzer asked Petitioner what time he was at the Donut Shack, Petitioner responded that he was there between 10:00 p.m. and 11:00 p.m. (Tr. 394). When Officer Platzer informed Petitioner that the robbery occurred at approximately 9:00 p.m., and that the store was closed following the robbery, Petitioner simply reiterated that "he had been there prior to the robbery." (Tr. 394). Petitioner then told Officer Platzer that he heard that Larry Mack had robbed the Donut Shack. (Tr. 409).

Petitioner also told Platzer that several hours after the robbery, he and Audrey were eating at a local Denny's restaurant where they saw "the dude from the Donut Shack, with a big ass fucking bandage on his head." (Tr. 421-22). When Audrey asked Petitioner, "what happened to him," Petitioner responded, "mother fuckers robbed his ass tonight." (Tr. 422).

**Larry Mack**

Mack testified that he and Petitioner robbed the Donut Shack on January 16, 2003. (Trial Transcript, January 8, 2004, 424-26). Mack was initially charged with two counts of armed robbery, for which Mack could have received a sentence of life imprisonment. (Tr. 424-27). Mack subsequently entered into an agreement with the prosecutor, pursuant to which Mack agreed to plead guilty to one count of aiding and abetting armed robbery and one count of unarmed robbery, for which Mack could receive sentences of 15 years in prison. (Tr. 427-28). In return, Mack agreed

6

to "cooperate" and testify against Petitioner.  (Tr. 428).

Mack testified that on the afternoon of January 16, 2003, he was at Sierra Eagle's and Audrey Cornell's[1] residence.  (Tr. 429-30).  Later that day, Petitioner arrived and asked Mack if he would help him rob the Donut Shack.  (Tr. 430-32).  Mack agreed.  (Tr. 432).  The pair then departed in Audrey Cornell's vehicle.  (Tr. 433).  The pair first traveled to Petitioner's residence to retrieve Petitioner's BB gun.  (Tr. 434).  This was a handgun style weapon that had been spray painted gold.  (Tr. 434).  Mack and Petitioner then traveled to the Donut Shack.  (Tr. 434-35).

After arriving, the pair agreed that Mack would enter the store "to see who was all in there and exactly where the cameras were and stuff."  (Tr. 435).  Mack entered the store and "asked for some beer."  (Tr. 436).  When Rajinder Kapoor told Mack that the beer was in the cooler, Mack exited the store.  (Tr. 436).  Mack and Petitioner then drove to a nearby location to plan the robbery.  (Tr. 436).  Mack told Petitioner that he would enter the store and "get the owner to go into the cooler" with him which would afford Petitioner "enough time while we are in the cooler to come in and grab the money."  (Tr. 436-38).  Mack instructed Petitioner that after he (Mack) entered the store to "wait ten seconds for us to go in the back and then come in."  (Tr. 438-39).  Mack and Petitioner then exited the car and walked to the Donut Shack.  (Tr. 436-37).

Mack re-entered the Donut Shack and asked Kapoor for a case of beer.  (Tr. 439).  Kapoor walked with Mack back to the cooler.  (Tr. 439-42).  After showing Mack where the beer was located, Kapoor exited the cooler.  (Tr. 442-43).  When Mack exited the cooler he saw Petitioner "standing in front of [Kapoor] with the gun in his hand" and "yelling at [Kapoor] to stay back."  (Tr. 443).  Kapoor "came back towards the entrance of the back room," at which point Mack

---

[1]  Audrey Cornell was also known as Audrey O'Brien.  (Tr. 430).

instructed him "to stay back in the room." (Tr. 443). Petitioner then "ran around to the cash register." (Tr. 443-44). Mack ran towards Sam Dado, who "jumped on the floor" and "threw money at [Mack's] feet." (Tr. 444-46). Mack picked up the money. (Tr. 446). Petitioner then "jumped over the counter" and the pair exited the store. (Tr. 446).

As the pair was running away from the Donut Shack, Petitioner "threw" his gun "over by" the swimming pool in the Rivertown Green apartment complex. (Tr. 446). After they drove away, the pair, who had worn gloves during the robbery, threw their gloves out of the car window. (Tr. 447). Petitioner and Mack returned to Audrey Cornell's residence. (Tr. 447). The pair went down into the basement and "started separating the money and counting it up." (Tr. 447). Cornell then entered the basement, at which point Petitioner gave her $50 for the use of her car. (Tr. 448).


**Audrey Cornell**

Cornell acknowledged that she was also known as Audrey O'Brien. (Trial Transcript, January 8, 2004, 491). As of January 2003, Cornell was living with Sierra Eagle. (Tr. 491). On January 16, 2003, she returned home at approximately 6:20 p.m. (Tr. 492). At "some point" that evening, Petitioner and Larry Mack were present at the residence. (Tr. 493). Cornell acknowledged that Petitioner borrowed her car that evening, but asserted that he returned between 7:30-8:00 p.m. (Tr. 493-94). Cornell also denied that Petitioner later gave her $50 for the use of her car. (Tr. 495).

The night of January 16, 2003, Cornell, Petitioner, Mack, and another man stayed at a hotel. (Tr. 496-97). Petitioner paid for the room in cash. (Tr. 497). Cornell later told a detective that Petitioner "doesn't usually have a whole lot of money." (Tr. 498). At trial, however, Cornell

testified that Petitioner had received "back pay" from a job he had recently worked. (Tr. 498).

Cornell acknowledged that when asked by the detective where Petitioner got the money to pay for

the hotel room, she stated that she did not know. (Tr. 498-99). Cornell acknowledged that the group

later went to Denny's, where they observed "somebody who looked like they'd been hurt badly."

(Tr. 500). Cornell denied that Petitioner identified the man as the owner of the Donut Shack or that

he had been robbed earlier that evening. (Tr. 500). Cornell did acknowledge, however, that

Petitioner owned a "gold-colored" gun. (Tr. 501-02).


**Jennifer Robbins**

Robbins testified that as of January 2003, her mom and dad worked at Rivertown

Green apartments. (Trial Transcript, January 8, 2004, 515). One day in January, Robbins was

playing near the apartment's pool when she discovered a gun. (Tr. 515-17). The gun was turned

over to the police. (Tr. 517-20).


**David Fajardo**

As of January 23, 2003, Fajardo was employed as a City of Port Huron Police

Officer. (Trial Transcript, January 8, 2004, 522). On that date, Officer Fajardo was dispatched to

the Rivertown Green apartment complex. (Tr. 522-23). Fajardo met with Jennifer Robbins who told

him that she "found a BB gun near the pool area." (Tr. 523). Fajardo took the gun, a BB pistol that

had been painted "gold over black," into custody. (Tr. 523-25).


**Ronald Martin**

Petitioner testified that at approximately 6:20 p.m. on January 16, 2003, he picked up Audrey Cornell from her job and drove her home. (Trial Transcript, January 9, 2004, 551-52). Between 7:00-7:30 p.m., Petitioner drove to a local gas station to purchase cigarettes. (Tr. 552-54). When Petitioner returned to Cornell's residence, Larry Mack was present. (Tr. 554). Later that evening, Petitioner drove Cornell's car to the Donut Shack to purchase beer. (Tr. 555-56). After purchasing beer, Petitioner returned to Cornell's residence, at which point Mack departed. (Tr. 556-57). After Mack departed, Petitioner walked to his fiance's house to put his daughter to bed. (Tr. 557). Petitioner testified that he departed Cornell's residence between 8:30-9:00 p.m. (Tr. 557). Approximately 40 minutes later, Petitioner returned to Cornell's residence. (Tr. 557-58). By this point, Mack had also returned to Cornell's residence. (Tr. 558). Shortly thereafter, Petitioner and several other people departed and went to a hotel to stay the night. (Tr. 558-59). Petitioner denied participating the Donut Shack robbery. (Tr. 560). Petitioner asserted that at the time he was working as a construction foreman, taking home $900-$1000 weekly. (Tr. 559).

**Sierra Eagle**

Eagle testified that as of January 16, 2003, Audrey Cornell was living with her. (Trial Transcript, January 9, 2004, 580). On that evening, Petitioner and Larry Mack were present at her residence. (Tr. 581). At approximately 8:30 p.m. Petitioner and Mack departed. (Tr. 582). Later that evening, Petitioner told Eagle, "I hit an old guy." (Tr. 586). Still later that evening, Eagle went to Denny's with Petitioner, Cornell, and another man. (Tr. 587). While they were sitting in Denny's, they saw "the guy from the Donut Shack" enter, at which point Petitioner stated that "he had been hit earlier that night in the robbery that had taken place." (Tr. 587). Cornell later told

Eagle that on the night of the robbery Petitioner had given her $50 for the use of her car. (Tr. 590).

Following the presentation of evidence, the jury found Petitioner guilty of two counts of armed robbery. (Tr. 673). After the verdict was received, Petitioner conceded that he had previously been convicted of two felonies. (Tr. 676-77). Petitioner was sentenced to serve 15-40 years in prison. (Sentencing Transcript, February 9, 2004, 18). Petitioner appealed his conviction to the Michigan Court of Appeals, asserting the following claims:

I. Defendant is entitled to a new trial based on the affidavit signed by the co-defendant that Mr. Martin did not commit the armed robbery; the trial court abused its discretion in denying defendant's motion for new trial without conducting an evidentiary hearing.

II. The trial court denied Mr. Martin his right of confrontation by denying his motions for discovery.

III. Judge Deegan committed reversible error in granting the prosecutor's trial day motion to endorse witness Sierra Eagle over defendant's timely objection, in allowing her to testify in rebuttal, and in refusing to grant the motion to sequester the witness.

    A. Allowing the late endorsement of Sierra Eagle as a witness was error.

    B. Sierra Eagle's testimony was improper rebuttal; counsel was ineffective in failing to object on this ground.

    C. Sierra Eagle's testimony was tainted by the denial of the motion to sequester.

IV. Defendant was denied a fair trial by the trial court's legally erroneous decision to allow impeachment of defendant with a prior receiving or concealing stolen property conviction.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Martin,* No. 253797, Opinion (Mich. Ct. App., May 17, 2005). Asserting the same claims, Petitioner appealed this determination in the Michigan Supreme Court. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Martin,* No. 128881, Order (Mich., Dec. 15, 2005). On December 19, 2006, Petitioner initiated the present action, asserting the following claims:

I.      The trial court denied Petitioner's Fourteenth Amendment right to a fair trial when it denied his motion for a new trial without conducting an evidentiary hearing.

II.     The trial court and court of appeals denied Petitioner his Sixth Amendment right to confrontation by denying his motions for discovery.

III.    Judge Deegan committed reversible error in granting the prosecutor's trial day motion to endorse witness Sierra Eagle over Petitioner's timely objection, in allowing her to testify in rebuttal, and in refusing to grant the motion to sequester the witness.

IV.     Petitioner was denied a fair trial by the trial court's legally erroneous decision to allow impeachment of Petitioner with a prior receiving and concealing conviction.

## STANDARD OF REVIEW

Martin's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

adjudicated on the merits in State court proceedings unless the adjudication of the claim —

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529

U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does

not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Denial of Motion for Discovery and New Trial

On August 16, 2004, Petitioner filed a motion in the trial court for discovery and a new trial. (Dkt. #11). In support of this motion, Petitioner submitted an affidavit allegedly executed by Larry Mack,[2] in which Mack asserted that neither he nor Petitioner were involved in the January 16, 2003 robbery of the Donut Shack. Mack asserted that the robbery was instead committed by a man named Ronald White. In light of this affidavit, Petitioner moved to discover the contents of

---

[2] Mack's affidavit is not part of the state court record and Petitioner has not included this affidavit with his pleadings in this matter.

Mack's "defense attorney's file," on the ground that such may contain "exculpatory information. . .which is necessary to corroborate his motion for new trial." Petitioner also moved for a new trial based on Mack's affidavit. *Id.* The trial judge denied Petitioner's motions. (Dkt. #34). Petitioner asserts that the trial court violated his right to a fair trial by denying his motion for discovery and new trial without first conducting an evidentiary hearing.

The trial judge conducted a hearing on Petitioner's motion, but did not permit Petitioner to introduce additional evidence in support thereof. Following this hearing, the trial judge denied Petitioner's motion for discovery and new trial, finding that

> In this case the court does recall Mr. Mack's testimony at trial and found him to be a credible witness against the Defendant. The court has reviewed the affidavit and, and finds that it is self-serving and based at least in part on Mr. Mack's dissatisfaction with the sentence that he received. His declarations of his own innocence and the Defendant's appear to be without merit.
>
> Defendant also seeks discovery of Mr. Mack's file held by his defense attorney counsel asserting that it contains certain information regarding Ronald White. The court also finds this request to be without merit. Mr. Mack had plenty of opportunity to reveal the alleged involvement of third parties to the officers during the investigation, during the exam or at the trial and failed to do so. To now go on a fishing expedition through a defense attorney's work product seems unnecessary.
>
> The court finds that the newly discovered evidence presented by the Defendant in the form of an affidavit recanting testimony of Larry Mack to be without sufficient credibility to warrant a new trial and, therefore, the motion is denied.

(Hearing Transcript, Sept. 13, 2004, 7-8).

In rejecting this particular claim, the Michigan Court of Appeals concluded that the trial judge had not abused his discretion. *People v. Martin,* No. 253797, Opinion at 3-4 (Mich. Ct. App., May 17, 2005). The court of appeals observed that where "newly discovered evidence

consists of recantation testimony," such "is generally considered untrustworthy." *Id.* at 4. As the court of appeals also noted, the trial court found Mack's trial testimony to be credible and corroborated by the other evidence presented at trial. The court of appeals further observed that "[b]ecause Mack's testimony at trial coincided with established facts, while his affidavit did not, his trial testimony was more reliable than the affidavit." *Id.*

To obtain relief on this particular claim, Petitioner must demonstrate that the trial judge's decision to deny his motion without first conducting an evidentiary hearing was "so egregious that it violated his right to a fundamentally fair trial." *Pudelski v. Wilson*, - - - F.3d - - -, 2009 WL 2475427 at * 12 (6th Cir., Aug. 14, 2009). Fundamental fairness does not "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). A decision by a state court violates fundamental fairness only if it violates "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.*

Petitioner's motion for discovery and new trial was not based on "newly discovered" evidence, but was instead supported by nothing more than the subsequent assertion by Larry Mack that he testified untruthfully at trial. As the trial judge correctly observed, Mack's self-serving assertion that somebody else committed the robbery was not supported by any evidence and, moreover, was contradicted by the evidence presented at trial. In sum, the trial judge appropriately determined that Petitioner's motion was without merit. The Court is aware of no authority that characterizes as "fundamental" the right of a convicted defendant to an evidentiary hearing on a post-conviction motion that enjoys no evidentiary support. In sum, the decision by the Michigan

Court of Appeals rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.**      **Confrontation Clause and Due Process Claims**

Prior to trial, Petitioner moved in the trial court for an order permitting him to discover Larry Mack's "defense attorney's file." (Hearing Transcript, August 18, 2003, 26-30). The trial judge denied Petitioner's motion. Petitioner asserts that this decision violated his Sixth Amendment "right of confrontation," as well as his due process right to discover exculpatory evidence prior to trial, as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963).

A.      Confrontation Clause

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him." *Cruz v. New York*, 481 U.S. 186, 189 (1987). This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony. *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911) (adequate confrontation requires that the accused have the opportunity to see the witnesses against him face-to-face at trial). The Confrontation Clause insures that each witness "will give his statements under oath - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *Lee v. Illinois*, 476 U.S. 530, 540 (1986). The

Confrontation Clause also permits the jury to observe the witnesses, enabling them to judge by their demeanor on the stand whether they are worthy of belief. *See Mattox v. United States*, 156 U.S. 237, 242-43 (1895).

The "main and essential purpose" of the Confrontation Clause, is "to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). However, the Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987). Accordingly, the Confrontation Clause is not implicated by a pre-trial decision concerning the scope of discovery. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 52-53 (1987) ("The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony."); *see also*, *United States v. El-Alamin*, - - - F.3d - - -, 2009 WL 2366384 at *7 (8th Cir., Aug. 4, 2009) (Confrontation Clause not implicated by pre-trial discovery ruling); *United States v. LaVallee*, 439 F.3d 670, 692 (10th Cir. 2006) ("The Confrontation Clause is not a constitutionally compelled rule of pretrial discovery").

The decision by the trial court to not allow Petitioner to discover the contents of records maintained by Larry Mack's attorney concerning his representation of Mack did not violate Petitioner's Confrontation Clause rights. Larry Mack testified at trial and Petitioner was afforded ample opportunity to cross-examine him. Accordingly, this claim raises no issue on which habeas relief may be granted.

B.       Brady Claim

Petitioner also asserts that the decision by the trial judge not to permit discovery of records maintained by Larry Mack's attorney violated his right to discover exculpatory evidence prior to trial, in violation of the rule articulated in *Brady v. Maryland*, 373 U.S. 83 (1963).

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*, 373 U.S. at 87). The material which must be disclosed under *Brady* "encompasses impeachment evidence as well as exculpatory evidence." *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

To establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed evidence was material. *See Bushard v. Yukins*, 2004 WL 74659 at *1 (6th Cir., Jan. 7, 2004) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)). The materiality requirement is satisfied where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Whitley*, 514 U.S. at 435). In short, Petitioner must demonstrate a "reasonable probability of a different result." *Dretke*, 540 U.S. at 698 (quoting *Whitley*, 514 U.S. at 434).

Petitioner's claim fails for at least two reasons. First, the information in question was maintained by the attorney representing Larry Mack. There is no evidence or allegation that the prosecution was aware of or possessed the information in question. Thus, the *prosecution* did not

withhold or suppress any information. Furthermore, Petitioner has failed to establish that the evidence in question was favorable or material to his cause. The Michigan Court of Appeals rejected this particular claim. *People v. Martin,* No. 253797, Opinion at 4-5 (Mich. Ct. App., May 17, 2005). This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.          Sierra Eagle**

On the first day of trial, the prosecutor moved to amend his witness list to include Sierra Eagle. (Trial Transcript, January 6, 2004, 182). The prosecutor asserted that he had only recently learned that Eagle might be able to provide relevant testimony. (Tr. 182-85). Petitioner objected on the ground that the prosecutor's request was untimely. (Tr. 185-87). The trial judge denied the prosecutor's request to present Eagle's testimony in his case-in-chief, but further stated that "if there's a basis that she might be called as a rebuttal witness, depending on how the evidence is presented, we would certainly allow that to take place." (Tr. 190).

On the third day of trial, Petitioner moved to sequester Sierra Eagle. (Trial Transcript, January 8, 2004, 376). The trial judge denied the request, noting that "there are several witnesses that were endorsed on this case and neither side were asking that any of them be excluded 'til at this particular point." (Tr. 378). Petitioner asserts that the trial judge's decisions violated his right to due process and a fair trial. Petitioner also asserts that his attorney was ineffective for failing to object to the improper nature of Eagle's rebuttal testimony.

A.      Decision to Permit Eagle to Testify

Petitioner asserts that the trial judge's decision to allow Sierra Eagle to testify in rebuttal violated state law.  Petitioner is not entitled to habeas relief, however, based upon a violation of state law, *see* 28 U.S.C. § 2254(a), as this Court "must accept as valid a state court's interpretation of the statutes and rules of practice of that state." *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  A violation of state law merits habeas relief only where such violation "amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution." *Cristini*, 526 F.3d at 897.

Petitioner was able to (and did) interview Sierra Eagle at least one day before she testified.  (Trial Transcript, January 8, 2004, 378).  Eagle's testimony was largely cumulative to other testimony and certainly did not comprise the heart of the case against Petitioner.  The Court, therefore, fails to discern how the trial judge's ruling on this matter constituted a fundamental miscarriage of justice or deprived Petitioner of the right to due process.  Thus, this claim raises no issue on which habeas relief may be granted.


B.      Denial of Motion to Sequester Sierra Eagle

As noted above, the trial judge denied Petitioner's untimely motion to sequester Sierra Eagle.  Petitioner asserts that such violates his right to due process and a fair trial.

Questions regarding the sequestration of witnesses fall within the trial judge's discretion to control and manage a trial.  *See Geders v. United States*, 425 U.S. 80, 87 (1976).  The Supreme Court has never held that the failure to sequester witnesses violates a criminal defendant's

constitutional rights.  *See Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir. 2008).  Petitioner's claim that the failure to sequester Eagle denied his right to due process and a fair trial is unpersuasive.

First, this was not a circumstance in the court ordered the sequestration of other witnesses, but simply declined to enforce such an order against Eagle.  As the trial judge recognized when denying Petitioner's untimely motion to sequester Eagle, the parties did not seek the sequestration of any other witnesses.  Moreover, as the Michigan Court of Appeals correctly observed, because Petitioner has "failed to point to a single instance in which Eagle's testimony was arguably colored by that of previous witnesses," he cannot demonstrate that he suffered any prejudice as a result of the trial judge's decision not to sequester Eagle.  *People v. Martin,* No. 253797, Opinion at 7 (Mich. Ct. App., May 17, 2005).  This claim, therefore, raises no issue on which habeas relief may be granted.

## C.    Ineffective Assistance of Counsel

As noted above, Petitioner claims that Sierra Eagle's testimony violated Michigan law against improper rebuttal testimony.  Petitioner asserts that his attorney was ineffective for failing to object to the improper nature of Eagle's testimony.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms.  *Id.* at 688.  In assessing such a claim, however, the Court must

"indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

The Michigan Court of Appeals rejected Petitioner's claim that Eagle's testimony constituted improper rebuttal testimony. *People v. Martin,* No. 253797, Opinion at 6 (Mich. Ct. App., May 17, 2005). As there was nothing improper about Eagle's testimony, Petitioner cannot demonstrate that he was prejudiced by his counsel's failure to object thereto. Thus, this claim raises no issue on which habeas relief can be granted.


**IV.**          **Impeachment Evidence**

As previously noted, Petitioner testified on his own behalf in this matter. On cross-examination, the following exchange occurred between Petitioner and the prosecutor:

> Q:      Now, just one other thing. You have been convicted
>          of some previous felonies, haven't you?
>
> A:      Yes, sir.
>
> Q:      And in 1997 - in December of 1997 you pled guilty to

the felony charge of receiving stolen property in excess of $100, is that correct?

A:     Yes, sir.

Q:     And then in December of 2002, there's a credit card that was stolen and you pled guilty in March of this year, excuse me, 2003, March 24th, 2003, to the charge of attempted possession of a stolen credit card, didn't you?

A:     Yes, sir.

Q:     And that's an attempted felony; is that correct?

A:     Um, I believe so, yes, sir.

(Trial Transcript, January 9, 2004, 578).

Petitioner asserts that permitting the prosecutor to impeach him with evidence of his conviction for receiving stolen property was improper under Michigan law and, therefore, violated his right to a fair trial.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized

that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

The Michigan Court of Appeals rejected Petitioner's claim that admission of his conviction for receiving stolen property violated Michigan law. *People v. Martin,* No. 253797, Opinion at 7-10 (Mich. Ct. App., May 17, 2005). The court found improper the analysis in which the trial court engaged in support of its decision to permit the prosecutor to impeach Petitioner with evidence of this particular conviction. *Id.* at 7-9. The court of appeals further determined, however, that "[h]ad the [trial] court conducted the [appropriate] analysis, it would have been within its discretion to admit the conviction pursuant to [Michigan Rule of Evidence] 609." *Id.* at 9. The court concluded its analysis by stating

> Nevertheless, we conclude that failure to conduct the analysis was not outcome determinative. The prosecutor merely asked whether defendant had committed the offenses, and defendant simply replied yes. The prosecutor noted during closing argument that defendant's convictions could be used to weigh his credibility but not for any other purpose; the prosecutor further noted that Mack's previous convictions could be used for the same purpose. And the court instructed the jury on the proper use of defendant's previous convictions. Given the amount of evidence against defendant, the close evidentiary question with respect to probative value and prejudicial effect, the fact that the prosecutor did not expand on defendant's prior convictions, and the prosecutor's and the court's

> instructions to the jury about the proper use of the convictions, the
> admission of the receiving or concealing stolen property conviction
> did not affect the outcome of defendant's case.

*Id.* at 10.

As the Michigan Court of Appeals correctly determined, the admission of the evidence in question did not unfairly prejudice Petitioner or deny him of the right to a fair trial. The Court further notes that permitting the prosecutor to impeach Petitioner with evidence of his previous convictions does not offend any fundamental principle of justice. As the United States Supreme Court has recognized, "[i]t is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like." *Ohler v. United States*, 529 U.S. 753, 759 (2000) (quoting *McGautha v. California*, 402 U.S. 183, 215 (1971)). The Court concludes, therefore, that this claim raises no issue on which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Martin's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order.

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  November 4, 2009

 /s/ Ellen S. Carmody_____
ELLEN S. CARMODY
United States Magistrate Judge